Joseph A. Creitz, Cal. Bar No. 169552
Lisa S. Serebin, Cal. Bar No. 146312
CREITZ & SEREBIN LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 466-3090
Email: joe@creitzserebin.com
Email: Lisa@creitzserebin.com

*James A. Walcheske, WI Bar No. 1065635
*Scott S. Luzi, WI Bar No. 1067405
*Paul M. Secunda, WI Bar No. 1074127
*Pro Hac Vice Applications Pending
WALCHESKE & LUZI, LLC
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| WALTER J. GRUBER, JR., individually, and as Representative of a Class of Participants and Beneficiaries of the Grifols Employee Retirement Savings Plan,<br><br>Plaintiff,<br><br>v.<br><br>GRIFOLS SHARED SERVICES NORTH AMERICA, INC.<br><br>and<br><br>BOARD OF DIRECTORS OF GRIFOLS SHARED SERVICES NORTH AMERICA, INC.,<br>Defendants | Case No: 2:22-cv-2621<br><br>CLASS ACTION COMPLAINT FOR CLAIMS UNDER ERISA, 29 U.S.C., § 1132(a)(2) |

COMES NOW Plaintiff, William J. Gruber, Jr., individually and as representative of a Class of Participants and Beneficiaries of the Grifols Employee Retirement Savings Plan (the "Plan" or "Grifols Plan"), by his counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants, alleges and asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.      The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.      The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.      Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.      Defendants, Grifols Shared Services North America, Inc. ("Grifols") and the Board of Directors of Grifols Shared Services North America, Inc. ("Board Defendants") (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary

control over the 401(k) defined contribution pension plan – known as Grifols Employee Retirement Savings Plan (the "Plan" or "Grifols Plan") – that it sponsors and provides to its employees.

6.     During the putative Class Period (April 19, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping fees [and managed account fees]," *Hughes*, 142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeeper, Fidelity Investments Institutional ("Fidelity"), and their high-cost managed account service provider, Strategic Advisors, Inc. ("SAI".)

7.     Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their fiduciary duty of prudence also by "offer[ing] needlessly expensive investment options," in the form of high-cost share classes. *See Hughes*, 142 S. Ct. at 740.

8.     These objectively unreasonable recordkeeping, managed account, and investment fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

9.     Defendants breached their fiduciary duty of prudence by offering higher cost investments to the Plan's participant when it could have offered the same investment opportunities at a lower cost, and by causing the Plan participants to pay excessive recording and managed account fees. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan recordkeeping, managed account, and investment services.

10.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating recordkeeping and managed account fees, as well as selecting and retaining investments, based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

11.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016.)

12.     The unreasonable recordkeeping and managed account fees paid, as well as the unreasonable selection and retention of Plan investments, inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

13.     These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

14.     To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of the duty of prudence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

18.     In conformity with 29 U.S.C. § 1132(h), Plaintiff served the Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

19.     Plaintiff, Walter J. Gruber, Jr., is a resident of the State of Wisconsin and currently resides in Mequon, Wisconsin, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

20.     Plaintiff has been a BGG Business Manager (West) at Grifols in Mequon, Wisconsin, from April 2014 to the present.

21.     Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered an actual injury to his own Plan account through paying excessive recordkeeping fees during the Class Period, that injury is fairly traceable to Defendants' unlawful conduct in maintaining Fidelity as its recordkeeper and consultant, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

22.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injury.

23.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping, managed account, and investment fees) necessary to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

24.     Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

25.     Grifols Shared Services North America, Inc. ("Grifols") has approximately 17,000 employees, with operations around the world. The company is one of the largest producers of plasma medicines in the world and has a presence in cities and towns across thirty-two (32) states. Its United States headquarters are located at 2410 Lillyvale Avenue, Los Angeles, CA 90032. In this Complaint, "Grifols" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

26.     Grifols acted through its officers, including the Board of Directors ("Board Defendants"), to perform Plan-related fiduciary functions in the course and scope of their business. Grifols appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Grifols is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

27.     Grifols is also the Plan Administrator. As the Plan Administrator, Grifols is also a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). Grifols has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). Grifols has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

28.     To the extent that there are additional officers and employees of Grifols who are or were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.

29.     The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Grifols's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

30.     In 2020, the Plan had about $1,035,952,055 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Fidelity to ensure that Fidelity, and the Plan investments selected, remained the prudent and objectively reasonable choice.

31.     With 10,550 participants in 2020, the Plan had more participants than 99.84% of the defined contribution plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $1,035,952,055 in assets in 2020, the Plan had more assets than 99.83% of the defined contribution plans in the United States that filed 5500 forms for the 2020 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE
## DEFINED CONTRIBUTION INDUSTRY

32.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

33.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

34.     Although Grifols contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees or other types of Plan expenses.

35.     While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income.

36.     Employers must consider the fees and expenses paid by a plan. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.

37.     Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

**Recordkeeping Services**

38.     Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans. Fidelity is one such recordkeeper.

39.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard bundled offerings of the same level and quality.

40.     There are two types of essential RKA services provided by all recordkeepers. For mega plans with substantial bargaining power (like the Plan), the first type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RKA services include, but are not limited to, the following standard services:

a.     Recordkeeping;

b.     Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.     Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.     Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.     Maintenance of an employer stock fund (if needed);

f.     Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.     Plan consulting services including assistance in selecting the investments offered to participants;

h.     Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i.     Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j.     Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

41.     The second type of essential RKA services, hereafter referred to as "Ad Hoc RKA" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).

42.     These "Ad Hoc RKA" services typically include, but are not limited to, the following:

   a. Loan processing;

   b. Brokerage services/account maintenance;

   c. Distribution services; and

    d. Processing of Qualified Domestic Relations Orders (QDROs).

43. For mega plans, like the Grifols Plan, any minor variations in the level and quality of RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

44. All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

45. The vast majority of fees earned by recordkeepers typically come from the bundled fee for providing the Bundled RKA services as opposed to the Ad Hoc RKA services.

46. Because dozens of Recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific Recordkeeper are apples-to-apples comparisons.

47. In other words, plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

48. Plan fiduciaries request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan. And they request that the Bundled RKA revenue requirement be expressed as either a flat per participant fee rate or an asset-based fee rate, although the use of an asset-based fee structure is not a best practice.

49. While there may be minor differences in the way the Bundled RKA services are delivered, those differences are not deemed material to the price comparisons in virtually all cases.

50. If a specific recordkeeper provided additional services that were not offered by the other recordkeepers, and those additional services were deemed material, then the plan fiduciaries would

make a downward adjustment to the price proposed by that specific recordkeeper in the amount of the value added by the additional service to make an apples-to-apples comparison with the other recordkeeping offerings. However, there are virtually never material differences in the Bundled RKA service offerings that would warrant a price adjustment.

51.     The Grifols Plan had a standard package of Bundled RKA services, providing recordkeeping and administrative services of a nearly identical level and quality to other recordkeepers who also service mega plans.

52.     There is nothing in the service and compensation codes disclosed by the Plan Fiduciaries in their Form 5500 filings during the Class Period, nor anything disclosed in the Participant section 404(a)(5) fee and service disclosure documents, that suggests that the annual Plan level fee of 0.0625% of the Plan's assets "recordkeeping fee" charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

53.     Accordingly, the disparity between the Plan's recordkeeping fee of 0.0625% of the Plan's assets, and the fee paid by several other similarly sized plans for the same standard bundle of RKA services, cannot be explained by any additional services, or the quality o those services, provided by Fidelity to the Plan.

54.     To the extent that additional services were provided by other Plan providers to Plan participants, those services were *in addition to* the 0.0625% of the Plan's assets annual "recordkeeping fee." Indeed, the 2021 404a-5 participant disclosure states that "[o]ther Plan administrative fees and expenses may be deducted proportionally based upon Plan account balance."

55.     Because recordkeepers offer the same bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizable number of participants.

56.     Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased. Recordkeepers are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other

things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

57.     By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the Grifols Plan. In other words, reasonable recordkeeping fees paid in 2019 are representative of the reasonable fees during the entire Class Period.

58.     The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.  As a plan gains more participants, the reasonable market rate for the services provided by the recordkeeper will decline.

59.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

60.     As a result, recordkeepers often make separate contractual arrangements with mutual fund providers. For example, recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

61.     Recordkeepers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

62.     Regardless of the pricing structure that the plan fiduciary negotiates with a service provider, and Plaintiff expresses no preference, the amount of compensation paid to service providers, including the recordkeepers, must be reasonable (not the *cheapest* or *average* in the market.)

63.     As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the compensation is objectively reasonable by understanding the market for such recordkeeping services.

**Investments**

64.     Plan Fiduciaries of a defined contribution plan have a continuing and regular responsibility

to select and monitor all investment options they make available to Plan participants.

65.     The primary purpose in selecting plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

66.     In selecting different investment options to make available to plan participants, plan fiduciaries are held to the prudent investor standard when choosing investment managers or, alternatively, choosing index investment options. When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark.

67.     The primary focus when choosing an active investment option to make available to plan participants is the skill of the portfolio manager. In many cases, a plan sponsor can receive the investment management services of the same portfolio manager through different share classes.

68.     When the same investment management services are provided through a mutual fund with different share classes, the fee paid to the portfolio manager is the same for all share classes. The difference in the share class fees is the amount of additional fees which can be used to pay for, among other things, recordkeeping services.

69.     As a result, when a prudent plan fiduciary can select from among several alternative share classes of the identical investment option, the prudent plan fiduciary selects the share class that provides the greatest benefit to plan participants, which is the *net expense ratio*, considering any revenue sharing paid for recordkeeping services.

**Managed Account Service Fees**

70.     During the Class Period, Defendants selected and made available to Plan participants managed account services through SAI called a "Fidelity Personalized Planning & Advice Fee."

71.     In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest his account in a portfolio of preselected investment options.

72.     Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

73.     The assets of a participant signing up for a managed account service are generally managed based upon a program designed by the managed account provider that purportedly customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

74.     In practice, little to no material customization is provided to the vast majority of plan participants which results in no material value to most participants relative to the fees paid.

75.     Many managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services.

76.     Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance. The fee rates for these services are often tiered. For example, the first $100,000 of assets may be charged a certain fee rate, the next $150,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate. This is appropriate because the marginal cost to manage the additional assets for the participant is essentially $0.

77.     The participant has no control over the fee rate they are charged if they use the managed account service. The fee levels are determined at the plan level through a contractual agreement between the managed account provider and plan fiduciaries.

78.     For at least the past decade, mega plans have been able to negotiate multiple facets of the fees charged by managed account providers.

79.     Managed account services are offered by covered service providers to increase the revenue they generate through their relationship with a retirement plan.

80.     In some cases, the covered service provider outsources the investment management services to a third-party provider, e.g., Morningstar, and charges a fee to the plan higher than what the third-

party provider charges the covered service provider. In other cases, the covered service provider provides all the services.

81.     The covered service provider will promote the managed account services over other potential solutions because the covered service provider will earn more revenue when participants use the managed account services.

82.     As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service.

83.     This industry segment has matured over the past decade and the costs of providing managed account services have declined and competition has increased. As a result, the fees providers are willing to accept for managed account services have been declining for many years.

84.     As with recordkeeping services, prudent fiduciaries regularly monitor the amount of managed account service fees the plan is paying and ensure the fees are reasonable compared to what is available in the market for materially similar services.

85.     The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers, stay abreast of the market rates for managed account solutions, and/or negotiate most-favored nation clauses with the managed account service providers and/or the recordkeepers.

86.     Defendants caused Grifols Plan participants, including Plaintiff, to pay excessive fees for managed account services to SAI, which were "estimated not to exceed 0.52% per year of [a participant's] average daily managed account balance."

87.     Defendants could have reduced these fees charged by SAI, Fidelity's wholly-owned subsidiary, by periodically soliciting bids from other managed account service providers and/or not staying abreast of the market rates for managed account solutions to negotiate market rates.

88.     The excessive fees paid by Plan participants to SAI using the managed account service were not objectively reasonable and breached Defendants' fiduciary duty of prudence to Plaintiff and other Class members, causing millions of dollars of lost retirement account funds.

**THE PLAN**

89.    During the entire Class Period, the Plan received recordkeeping services from Fidelity.

90.    At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants.

91.    The fees were also excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally offered to mega plans, like the Grifols Plan, regardless of the number of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500.

92.    It is clear, based on the 5500 forms and 404(a)(5) participant disclosures that Fidelity did not provide any services at any higher level that were not also part of the standard package of RKA services provided by all recordkeepers to mega plans.

93.    These excessive Plan recordkeeping fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

94.    During the Class Period, Defendants breached their duty of prudence owed to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan  to pay objectively unreasonable fees for recordkeeping services.

95.    Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

**STANDARD OF CARE FOR PRUDENT FIDUCIARIES**
**SELECTING & MONITORING RECORDKEEPERS**

96.    A plan fiduciary is required to fully understand all sources of revenue received by its recordkeeper. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the quality and level of services provided.

97.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, through soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

98.     Prudent plan fiduciaries can easily and inexpensively receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees.

99.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

100.    A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

101.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

102.    First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

103.    Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct com-pensation and revenue sharing being paid to the plan's recordkeeper.

104.    Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are

available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

105.    Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

**PLAN FIDUCIARIES FAILED EFFECTIVELY TO MONITOR**

**RECORDKEEPING FEES AND THE PLAN THUS**

**PAID UNREASONABLE RECORDKEEPING FEES**

106.    A plan fiduciary must continuously monitor its recordkeeping fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

107.    During the Class Period, Defendants failed to regularly monitor the Plan's recordkeeping fees paid to recordkeepers, including but not limited to Fidelity.

108.    During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Fidelity, in order to avoid paying unreasonable recordkeeping fees.

109.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable recordkeeping fees it paid to Fidelity and in light of the level and quality of recordkeeper services it received.

110.    From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual RKA fees, illustrating that the Plan had on average 9,302 participants with account balances and paid an average effective annual RKA fee of at least approximately $613,785, which equates to an average of at least approximately $66 per participant. These are the minimum amounts that could have been paid:

**Retirement Plan Services (RKA) Fees**

| | 2016 | 2017 | 2018 | 2019 | 2020 | *Average* |
|---|---|---|---|---|---|---|

| Participants | 7,547 | 8,704 | 9,468 | 10,239 | 10,550 | *9,302* |
|---|---|---|---|---|---|---|
| Est. RKA Fees | $484,388 | $584,247 | $621,147 | $646,354 | $732,789 | *$613,785* |
| Est. RKA Per Participant | $64 | $67 | $66 | $63 | $69 | *$66* |

111.    From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RKA fees paid by the Plan (as identified in the table above).

**Comparable Plans' RKA Fees Based on Publicly Available Information from Form 5500[1]**

| Plan | Participants | Assets | RKA Fee | RKA Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | White |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity | White |
| **Grifols Plan Average Fee** | **9,302** | **$750,339,600** | **$613,785** | **$66** | **Fidelity** | **Red** |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |

| | | | | | | |
|---|---|---|---|---|---|---|
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| Edward-Elmhurst Healthcare Retirement Savings Plan | 10,263 | $618,238,970 | $446,836 | $44 | Fidelity | White |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Viacom 401(K) Plan | 12,196 | $1,249,874,734 | $376,314 | $31 | Great-West | White |

[1]Price calculations are based on 2018 Form 5500 information.

112.    From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RKA fees paid by the Plan (as identified in the table above), with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



113.    From the years 2016 to 2020 and based upon the best publicly available the years 2016 to 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that the Plan paid an effective average annual RKA fee of at least $66 per participant for RKA.

114.    From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual RKA fee of around $36 per participant, if not lower.

115.    From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting in the exclusive best interest of the Plan's Participants the Plan actually would have paid significantly less than an average of approximately $613,785 per year in RKA fees, which equated to an effective average of approximately $66 per participant per year.

116.    From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, had Defendants been acting in the best interests of the Plan's participants, the Plan actually would have paid on average a reasonable effective annual market rate for RKA of approximately $334,858 per year in RKA fees, which equates to approximately $36 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay almost double what they could otherwise pay for RKA.

117.    From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its participants on average approximately $278,927 per year in RKA fees, which equates to on average approximately $30 per participant per year.

118.    From the years 2016 to 2020, and because Defendants did not act in the best interests of the Plan's participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $1,394,637 in unreasonable and excessive RKA fees.

119.    From the years 2016 to 2020 based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $1,907,016 in RKA fees.

120.    Defendants could have offered the exact same recordkeeping services, at the same level and quality, at a lower cost by using a different recordkeeper, but did not do so.

121.     Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these recordkeeping allegations are not about reasonable tradeoffs between recordkeepers providing a different level or quality of services.

122.     Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeeper, and Defendants could have obtained the same recordkeeping services for less from other, similar recordkeepers.

123.     The higher cost recordkeeping services selected by Defendants were substantially identical to lower-cost recordkeeping services available in the market as highlighted by the chart above.

124.     Plaintiff paid these excessive recordkeeping fees in the form of direct compensation to the Plan and suffered injuries to their Plan accounts as a result.

125.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RKA fees it paid to Fidelity.

126.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RKA fees it paid to Fidelity vis-à-vis the fees that other RKA providers would charge, and would have accepted, for the same level and quality of services.

127.     During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's RKA fees it paid to Fidelity, but Defendants either simply failed to do so, or did so ineffectively given that it paid almost double for RKA fees than it should have.

128.     During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the RKA fees it paid to Fidelity, it would have realized and understood that the Plan was compensating Fidelity unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants and would have removed Fidelity as an imprudent choice.

129.     The Plan recordkeeping fees were also excessive relative to the recordkeeping services received, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. In other words, any difference in recordkeeping fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

130.     During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher RKA fees than they should have been and/or by failing to take effective remedial actions including removing Fidelity as Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiffs and Plan participants.

**STANDARD OF CARE FOR PRUDENT FIDUCIARIES**

**SELECTING AND MONITORING INVESTMENT OPTIONS**

131.     For all practical purposes, there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

132.     That accepted process involves evaluating the performance history, tenure, and stability, of the current portfolio manager, the risk adjusted returns, and the fees.

133.     When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

134.     From the perspective of a plan participant, the other critical component of the analysis is the fees.  The "total expense ratio" of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

135.     As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for recordkeeping services as well as the

different fee components of the investment options selected to be made available to plan participants.

136.    Plan fiduciaries of plans as large as the Defendant's Plan are deemed to be "institutional investors" and are deemed to have a higher level of knowledge and understanding of the different investment share classes and the different components of fees within the total expense ratio of an investment option.

137.    In fact, as "institutional investors," retirement plans often have the ability to access investment options and service structures that are not available or understood by retail investors such as individual plan participants like Plaintiff.

138.    As a result, when a plan fiduciary can choose among different share classes (or other types of investment options, e.g., collective trusts) to receive the services of a specific portfolio manager, the plan fiduciary is required to understand all the fees related to the different share classes and collective trusts and choose the share class or collective trust that is in the best interest of the plan participants.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**THE PLAN PAID UNREASONABLY HIGH FEES**

**FOR IMPRUDENT SHARE CLASSES**

139.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets.

140.    There is no material difference between share classes other than costs – the funds hold identical investments and have the same portfolio manager.

141.    It is well known among institutional investors that mutual fund companies routinely waive investment minimums for large retirement plans, and they did so with the Plan.

142.    Mega defined contribution plans such as the Grifols Plan have sufficient assets to qualify for the lowest cost share classes.

143.    Unlike individual or retail investors, retirement plan fiduciaries have access to several different share classes.

144.    Choosing the share class that provides that provides the greatest benefit to plan participants is always the prudent choice because the use of the share class result in one of the following superior options: 1) the amount of the fee extraction to cover the recordkeeping fee will be lower; or 2) the amount of excess revenue being credited back to participant accounts is greater.

145.    Defendants knew or should have known that they are required to select the share classes that provide the greatest benefit to plan participants.

146.    Defendants knew or should have known that it must engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants in the form of the share class with lowest net expense ratio, considering revenue sharing used to pay for recordkeeping services.

147.    Defendants did not use share classes that provide the lowest net expense ratio in numerous cases.

148.    Defendants did not engage in an objectively reasonable search for and selection of the share classes that provide the lowest net expense ratio in numerous cases.

149.    The following charts identify Defendants' share class investments during the Class Period as compared to alternative prudent share class investments with the lowest net expense ratio:

| Defendants' Investment | | | | | Prudent Alternative Share Class | | | | | Defendants' Plan's Investment Excessive Fees (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | |
| GSMCX | Goldman Sachs Mid Cap Value Institutional Fund | 0.84% | 0.00% | 0.84% | GCMAX | Goldman Sachs Mid Cap Value A | 1.20% | 0.40% | 0.80% | 5% |
| GSSIX | Goldman Sachs Small Cap Value Inst | 0.96% | 0.00% | 0.96% | GSQTX | Goldman Sachs Small Cap Value Inv | 1.03% | 0.15% | 0.88% | 9% |
| MWTSX | Metropolitan West Total Return Bd Plan | 0.37% | 0.00% | 0.37% | MWTNX | Metropolitan West Total Return Bd Admin | 0.78% | 0.50% | 0.28% | 32% |
| OIGIX | Oppenheimer International Growth I Fund (R6) | 0.70% | 0.00% | 0.70% | OIGYX | Invesco Oppenheimer International Gr Y | 0.85% | 0.25% | 0.60% | 17% |
| | Average | 0.72% | 0.00% | 0.72% | | Average | 0.97% | 0.33% | 0.64% | 15.73% |

150.    The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally available to Defendants during the Class Period, including, but not limited to, standard reports prepared by Fidelity and its investment advisor, Capfinancial Partners, LLC.

151.    Based upon data and information reflected in the charts above, the excessive fee paid by participants during the Class Period as a result of Defendants' failure to use the prudent share class investments with the lowest net expense ratio was approximately 15.73%.

152.    There is no rational reason for a prudent plan fiduciary to choose an investment option that effectively charges a fee that is approximately 16% higher than an alternative investment option that provides the identical services of the same portfolio manager.

153.    Had Defendants engaged in an objectively reasonable search for, and selection of, the share class investments with the lowest net expense ratio, the Plan would have selected the alternative funds in the chart above.

154.    Defendants knew, or should have known, about the existence of share class investments with the lowest net expense ratios, and should have performed an analysis to determine the share class investments with the lowest net expense ratios.

155.    Defendants selected a share class that resulted in higher fees to Plan participants when a share class of the identical investment option was available that would have resulted in lower fees, to the substantial detriment of Plaintiffs and the Plan's participants.

156.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these share class allegations are not about reasonable tradeoffs between differently managed investments. The higher cost share classes selected by Defendants were identical to share class investments with the lowest net expense ratio.

157.    As an example, Plan fiduciaries selected the Metropolitan West Total Return Bond Plan Fund (MWTSX) and made it available to participants in the Plan from 2016 through at least 2020.

158.    As of December 31, 2020, Plan Participants had invested more than $60,594,000 in this investment option. The portfolio managers of this investment option were Stephen M. Kane, Laird R. Landmann and Bryan T. Whalen (Kane, Landmann & Whalen). Plan participants can receive the identical portfolio management services of Kane, Landmann & Whalen through several different investment options (share classes) with different fee structures. The fee structures for the varying share classes of this investment option, all managed by Kane, Landmann & Whalen, are set forth in the chart below:

/ / /

/ / /

/ / /

/ / /

/ / /

| Example of Different Share Class Fee Levels for Identical Portfolio Management Services | | |
|---|---|---|
| | Metropolitan West Total Return Bd Admin | Metropolitan West Total Return Bond Plan Fund |
| Share Class | Admin | Plan |
| Investment Advisor | Metropolitan West | Metropolitan West |
| Portfolio Managers | Stephen M. Kane, Laird R Landmann & Bryan T. Whalen | Stephen M. Kane, Laird R Landmann & Bryan T. Whalen |
| Ticker | MWTNX | MWTSX |
| Portfolio Management Fee | 0.35% | 0.35% |
| Total Expense Ratio | 0.78% | 0.37% |
| Revenue Sharing Credit | 0.50% | 0.00% |
| Net Investment Expense to Retirement Plans | 0.28% | 0.37% |

159.   The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period including, but not limited to, standard reports prepared by Fidelity and Capfinancial Partners.

160.   In the second to last row of the chart above, "Revenue Sharing Credit," is the portion of the "Total Expense Ratio" that is allocable to the provision of RKA.

161.   The Metropolitan West Total Return Bd Admin (MWTNX) has the lowest net expense ratio at 0.28%. Despite the Total Expense Ratio being higher, the Metropolitan West Total Return Bd Admin (MWTNX) provides the greatest benefit to Plan participants because the 0.50% in revenue sharing that is allocable to RKA services is a credit that is returned to the participants directly or used as a credit against the RKA fee.

162.   Plan Participants would have received the lowest net expense ratio for the portfolio management services of Kane, Landmann & Whalen if invested in the Metropolitan West Total Return Bd Admin (MWTNX).

163.   A prudent plan fiduciary ensures that the share class with lowest net expense ratio should be selected.

164.    A prudent plan fiduciary understands that the higher "sticker" price of the RKA fee portion of the expense ratio is not relevant since the RKA service provider returns excess revenue to the Plan and its participants.

165.    By selecting an investment option that charges more for identical portfolio management services, the Plan fiduciaries breached their duty of prudence.

166.    A prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on a quarterly basis, would have identified the share class that provided the greatest benefit to Plan participants, and would have transferred the Plan's investments into the alternative prudent share classes with the lowest net expense ratio at the earliest opportunity.

167.    During the Class Period, Defendants: 1) did not conduct an impartial and objectively reasonable review of the Plan's investments on a quarterly basis; 2) did not identify the prudent share classes available to the Plan; and 3) did not transfer the Plan's investments into prudent share classes with the lowest net expense ratios at the earliest opportunity.

168.    During the Class Period and because Defendants failed to act in the best interests of the Plan's participants by engaging in an objectively reasonable process when selecting its share classes, Defendants caused unreasonable and unnecessary losses to the Plan's participants through 2020 in the amount of approximately $649,599 and as detailed in the following chart:

| Actual Investment Lineup | | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| Net Investment Expense to Retirement Plans | $1,519,128 | $1,764,155 | $1,621,633 | $1,875,235 | $2,162,169 | $2,162,169 |

| Prudent Alternative Share Class | | | | | | |
|---|---|---|---|---|---|---|
| Net Investment Expense to Retirement Plans | $1,445,259 | $1,697,222 | $1,559,599 | $1,822,636 | $2,098,924 | $2,098,924 |
| Est. Investment Damages | $73,869 | $66,933 | $62,033 | $52,599 | $63,245 | $63,245 |
| Compounding Percentage (VIIIX) | | 21.82% | -4.41% | 31.48% | 18.41% | 28.69% |
| Est. Cumulative Investment Damages | $73,869 | $156,920 | $212,034 | $331,381 | $455,633 | $649,599 |

169.   By failing to recognize that the Plan was invested in share classes that resulted in higher fees when share classes that resulted in lower net expense ratios to Plan participants were available for the same investments, Defendants breached their fiduciary duties of prudence to Plaintiff and the Plan participants, causing them hundreds of thousands of dollars of retirement account losses during the Class Period.

### THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR
### THE MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT,
### THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES

170.   Defendants retained Fidelity's wholly-owned subsidiary, Strategic Advisors, Inc. ("SAI"), to provide a managed account service through which SAI charged Plan participants a "Personalized Planning & Advice Fee."

171.   For this service, up through at least the end of 2020, Defendants have allowed Plan participants to pay an annual fee of 0.52% for all level investment fees, without employing a tiered structure of fees based on amount of assets.

172.   The table below illustrates the fee rates paid by similarly situated plans for materially identical managed account services:

| Managed Account service fee rates of similarly situated plans | Fee on 1st Tier | Fee on 2d Tier | Fee on 3d Tier |
|---|---|---|---|
| Grifols "Personalized Planning & Advice" | 0.52% | - | - |
| AGFA Healthcare Corp. Employee Savings Plan (2018) | 0.40% | 0.30% | 0.20% |
| Caterpillar Sponsored 401(k) Plans (2016) | 0.40% | 0.30% | 0.20% |
| Citi Ret. Savings Plan (2015) | 0.35% | 0.30% | 0.25% |
| JC Penney 401(k) Savings Plan (2015) | 0.35% | 0.25% | 0.10% |
| Comcast Corp. Ret. Investment Plan (2019) | 0.00% | 0.30% | 0.20% |

173.   As illustrated above, in all cases, the participants in the other comparator plans are paying fee rates, at every tier, lower than those paid by Plan participants.

174.   A number of other managed account providers exist whose services are virtually identical to the services provided to Plan participants through the "Personalized Planning & Advice" service and whose fees range from 0.25% to 0.30% on all assets, e.g., Betterment, Vanguard, and Charles

Schwab, for plans much smaller than the Grifols Plan.

175.   The Kimberly-Clark 401(k) Profit Sharing and Retirement Plan, a similar mega Plan to Grifols, provided in 2020 managed account services through Fidelity to its participants at a much lower price on the following schedule: no fee up to the first $5000, 0.25% up to $100,000, 0.15% on the next $150,000, and 0.10% on assets greater than $250,000.

176.   The fee rates paid by the Plan participants for the Grifols Personalized Planning & Advice was excessive and objectively unreasonable given the Plan's size and negotiating power.

177.   Defendants could have offered the exact same managed account services at a lower cost by using a different managed account provider, but did not do so.

178.   Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these managed account allegations are not about reasonable tradeoffs between managed account service providers offering a different level or quality of services.

179.   Rather, Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing managed account service provider, and Defendants could have obtained the materially same managed account services for less through another provider if it had solicited competitive bids for the same services.

180.   The asset allocation created by the SAI was not materially different than the asset allocation of the age-appropriate target date option made available to the Plan's participants at a much lower fee.

181.   As the GAO recognized in its reports on managed accounts, "Similar advantages … can be achieved through other retirement investment vehicles outside of a managed account and without paying the additional managed account fee. For example, in one recent study, a record keeper that offers managed accounts through its platform showed that there are other ways to diversify using professionally managed allocations, such as target date funds, which can be less costly." THE UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE ("GAO"), *401(K) PLANS:*

*Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 32 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

182.     As a result, based on the value provided, the reasonable fee for Plan's PMP was zero or very close to zero.

183.     Defendants did not prudently evaluate the incremental value provided by the Plan's PMP managed account service to determine that the fees were warranted.

184.     A prudent fiduciary would have conducted periodic competitive solicitations (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan participants, to ensure that the amounts paid by the Plan for managed account services were reasonable. Had Defendants done so, Plaintiff and Plan participants would not have paid the excessive managed account service fees that it did.

185.     Based on the excessive amounts paid by the Plan for managed account services, it is reasonable to infer that Defendants failed to prudently monitor and manage the Plan's managed account services.

186.     Defendants' failure to properly monitor or control fees for the Plan's managed account service cost resulted in Plan participants paying excessive and objectively unreasonable fees, constitutes a separate and independent breach of the fiduciary duty of prudence, and cost Plaintiff and Plan participants who used the services millions of dollars of harm to their retirement accounts.

## CLASS ACTION ALLEGATIONS

187.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

/ / /

/ / /

/ / /

/ / /

/ / /

188.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Grifols Employee Retirement Savings Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning April 19, 2016 and running through the date of judgment.

189.    The Class includes over 10,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

190.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.    Whether Defendants breached their fiduciary duties to the Plan;

c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

d.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

191.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

192.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he is a Participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

193.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish

incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

194.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

195.    Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

196.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

197.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

198.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

199.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF

**Breach of Duty of Prudence of ERISA, as Amended**
**(Asserted by Plaintiff, on behalf of himself and the Class,**
**Against all Defendants – Recordkeeping Fees)**

200.    Plaintiff realleges all of the foregoing allegations as if fully set forth herein.

201.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)
and/or 1102(a)(1).

202.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in their administration of the Plan.

203.    Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable recordkeeping fees.

204.    During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's recordkeeping fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

205.    During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's recordkeeping fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

206.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable costs.

207.    During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

208.    Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

209.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breach-ing its duties under 29 U.S.C. § 1104(a)(1)(B).

210.    As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

211.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Grifols Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### Breaches of Duty of Prudence of ERISA, as Amended
### (Asserted by Plaintiff, on behalf of himself and the Class, Against all Defendants – Investment Management Fees)

212.    Plaintiff realleges all of the foregoing allegations as if fully set forth herein.

213.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

214.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in managing the investments, including share classes, of the Plan.

215.    Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

216.    During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

217.    During the Class Period, Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

218.    Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long said investments had been in the Plan.

219.    During the Class Period, Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

220.    Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan Participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis, eliminating funds or share classes that did not serve the best interest of Plan participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

221.    Defendants failed to employ a prudent process by failing to evaluate the cost and performance of the Plan's investments and fees critically or objectively in comparison to other more reasonable investment options. Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

222.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

223.    As a result of Defendants' breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses.

224. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**THIRD CLAIM FOR RELIEF**
**Breaches of Duties of Loyalty and Prudence of ERISA, as Amended**
**(Asserted by Plaintiff, on behalf of himself and the Class,**
**Against all Defendants –Managed Account Service Fees)**

225. Plaintiff realleges all of the foregoing allegations as if fully set forth herein.

226. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

227. 29 U.S.C. § 1104(a)(1)(B) imposes fiduciary duties of prudence upon Defendant in their administration of the Plan. Defendants, as fiduciaries of the Plan, are responsible for selecting a managed account service provider that charges reasonable managed account service fees.

228. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

229. During the Class Period, among other things, Defendants imprudently caused the Plan to pay excessive managed account service fees and failed to properly monitor and control those expenses.

230. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's managed account provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees.

231. During the Class Period, Defendants breached its duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process by failing to evaluate the cost and

performance of the Plan's managed account provider critically or objectively in comparison to other managed account options.

232.   Defendants' failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

233.   As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff, and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

234.   Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

## FOURTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Asserted by Plaintiff, on behalf of himself and the Class,
Against all Defendants– Recordkeeping Fees)**

235.   Plaintiff realleges all of the foregoing allegations as if fully set forth herein.

236.   Defendants had the authority to appoint and remove members or individuals responsible for Plan recordkeeping fees, and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

237.   In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan recordkeeping fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

238.   Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information;

maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

239.    The objectively unreasonable and excessive recordkeeping fees paid by the Plan inferentially suggest that Defendants breached their duty to monitor by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees and fee disclosures or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably recordkeeping expenses;

b.    Failing to monitor the process by which the Plan's recordkeeper was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c.    Failing to remove individuals responsible for Plan recordkeeping fees and fee disclosure whose performance was inadequate in that these individuals continued to pay the same recordkeeping costs even though solicitation of competitive bids would have shown that maintaining Fidelity as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

240.    As the consequences of the foregoing breaches of the duty to monitor for recordkeeping fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

241.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Grifols Plan all loses caused by their failure to adequately monitor individuals responsible for Plan recordkeeping fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## FIFTH CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
### (Asserted by Plaintiff, on behalf of himself and the Class,
### Against all Defendants– Investment Management Fees)

242.    Plaintiff realleges all of the foregoing allegations as if fully set forth herein.

243.    Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management fees, and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

244.    In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan investment management fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

245.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

246.    The objectively unreasonable and excessive investment management fees paid by the Plan inferentially suggest that Defendants breached their duty to monitor by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for Plan investment management fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably investment management expenses;

b.    Failing to monitor the process by failing to investigate the availability of more reasonably-priced investment management fees; and

c.    Failing to remove individuals responsible for Plan investment management fees and fee disclosure whose performance was inadequate in that these individuals continued to pay the same investment management costs even though solicitation of competitive bids would have shown that maintaining those share classes was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

247.     As the consequences of the foregoing breaches of the duty to monitor for investment management fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

248.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Grifols Plan all loses caused by their failure to adequately monitor individuals responsible for Plan investment management fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### SIXTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Asserted by Plaintiff, on behalf of himself and the Class,**
**Against all Defendants – Managed Account Fees)**

249.     Plaintiff realleges all of the foregoing allegations as if fully set forth herein.

250.     Defendants had the authority to appoint and remove members or individuals responsible for Plan managed account fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

251.     In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan managed account fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

252.     Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

253.     The objectively unreasonable and excessive managed account fees paid by the Plan inferentially suggest that Defendants breached their duty to monitor by, among other things:

> a.      Failing to monitor and evaluate the performance of individuals responsible for Plan managed account fees or have a system in place for doing so, standing idly by as the Plan suffered

significant losses in the form of objectively unreasonably managed account expenses;

b.      Failing to monitor the process by which the Plan's managed account service provider was evaluated and failing to investigate the availability of more reasonably-priced managed account providers; and

c.      Failing to remove individuals responsible for Plan managed account fees whose performance was inadequate in that these individuals continued to pay the same managed account costs even though solicitation of competitive bids would have shown that maintaining SAI as the managed account provider at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

254.    As the consequences of the foregoing breaches of the duty to monitor for managed account fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

255.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Grifols Plan all loses caused by their failure to adequately monitor individuals responsible for Plan managed account fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A Declaration the Defendants have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable recordkeeping, managed account, and investment

management costs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E. An Order requiring Grifols to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Grifols as necessary to effectuate relief, and to prevent Grifols's unjust enrichment;

F. An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H. An award of pre-judgment interest;

I. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J. Such other and further relief as the Court deems equitable and just.

Dated this 19th day of April, 2022

s/ Joseph A. Creitz
Joseph A. Creitz
Lisa S. Serebin
CREITZ & SEREBIN LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 466-3090
Fax: (415) 513-4475
Email: joe@creitzserebin.com
Email: lisa@creitzserebin.com

James A. Walcheske*
Scott S. Luzi*
Paul M. Secunda*
   * pro hac motions pending
WALCHESKE & LUZI, LLC
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

Counsel for Plaintiff